UNITED STATES EASTERN DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
AGAMEDE LIMITED, DERMOT BROWN, SEAMUS
MAGUIRE, GERARD LAGAN, PATRICK FINNEGAN,
KATHERINE FINNEGAN, BARTLEY FINNEGAN,
PAT FLYNN, ELIZABETH KIRKPATRICK, TONY
MURRAY, MARTIN GLEESON, PAT GLEESON,
PATRICK LAGAN, PADRAIC MALONEY, and
GERARD SLOWEY,

                                        Plaintiffs,            MEMORANDUM and
                                                                ORDER
                        -against-                         04-CV-2985 (SMG)


LIFE ENERGY & TECHNOLOGY HOLDINGS, INC.,
now known as GLOBAL ENVIRONMENTAL ENERGY
CORP. (BAHAMAS) and MILDRED ROSTOLDER
d/b/a NORTH AMERICAN TRANSFER COMPANY,

                                        Defendants.
-------------------------------------------------------------------------X
GOLD, S., U.S.M.J.:

## Introduction

Plaintiffs, an Irish corporation and several individual investors, allege that they are owners of stock certificates in Life Energy and Technology Holdings, Inc. ("LETH") and that defendant committed the common law tort of conversion of their LETH shares. More specifically, the corporate plaintiff alleges that LETH refused to issue a replacement certificate after its certificate was lost or stolen. The individual investors contend that they were promised shares of LETH in exchange for their investments, but never received the shares to which they were entitled.

Approximately one month after plaintiffs filed this lawsuit, LETH changed its name to

1

Global Environmental Energy Corp. and reincorporated in the Bahamas ("GEEC Bahamas"). After a hearing on the issue, I held that LETH is now known as GEEC Bahamas, directed the Clerk of the Court to amend the caption accordingly, and granted plaintiffs' motions for entry of default against GEEC Bahamas after it failed to appear in this litigation. Docket Entry 62.

## Discussion

*A.     Liability*

Once found to be in default, a defendant is deemed to have admitted all of the well-pleaded allegations in the complaint pertaining to liability. *See Greyhound Exhibitgroup, Inc., v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992), *cert. denied*, 506 U.S. 1080, 113 S. Ct. 1049 (1993); *Montcalm Pub. Corp. v. Ryan*, 807 F. Supp. 975, 977 (S.D.N.Y. 1992). A court, however, retains the discretion to determine whether a final default judgment is appropriate. *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993). Even after a defendant has defaulted, "[a] plaintiff must . . . establish that on the law it is entitled to the relief it seeks, given the facts as established by the default." *U.S. v. Ponte*, 246 F. Supp. 2d 74, 76 (D. Me. 2003) (citation omitted). *See also Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981) (recognizing the court's authority, even after default, to determine whether plaintiff has stated a cause of action).

First, I must address two preliminary issues: 1) the number of individuals seeking damages and 2) the statute of limitations. In addition to the individuals named in the complaint, plaintiffs seek damages for Claire Moore, Declan Maguire, Deirdre Maguire, Grainne Maguire, and Roisin Maguire, alleging that they, like the named plaintiffs, were promised LETH stock for their investments. Pl. Mem. pp. 6-7. Plaintiffs argue that Seamus Maguire, one of the named

2

plaintiffs, is the assignee of the claims for these individuals who are his children. Pl. Mem. p. 6; Seamus Maguire Decl. ¶ 2. The complaint, however, does not name these individuals as plaintiffs or allege any assignment of their claims. Accordingly, I must deny plaintiffs' application for damages on behalf of Claire Moore, Declan Maguire, Deirdre Maguire, Grainne Maguire, and Roisin Maguire. *See* Fed. R. Civ. P. 54(c) ("A judgment in default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment"). Additionally, I am dismissing the claims of Patrick Lagan, a named plaintiff, from this lawsuit. Patrick Lagan moved to voluntarily dismiss his claim for damages on May 31, 2006, but then he subsequently withdrew his motion. Docket Entries 66, 67, 91. Patrick Lagan, however, failed to submit any application for damages. Accordingly, I deem his claim abandoned and it is dismissed with prejudice for failure to prosecute.

Next, I note that the defendant may have had a meritorious limitations defense with respect to a number of the plaintiffs. The statute of limitations for conversion is three years. N.Y. C.P.L.R. § 214(3). Plaintiffs filed their complaint on July 15, 2004. In their application for damages, though, many of the plaintiffs allege that their shares were converted in March or May of 2001, which would mean that their claims would be time-barred.[1] *See* Pl. Mem. pp. 5-8. The Second Circuit, however, disfavors *sua sponte* dismissal due to a statute of limitations bar because a limitations defense may be waived and does not deprive a court of jurisdiction. *Davis*

---

[1] Agamede Limited, the corporate plaintiff, alleges that the conversion of its shares occurred on March 14, 2002, the date Agamede received a letter from LETH's stock transfer agent indicating that LETH would not process a replacement certificate for Agamede's lost or stolen certificate. *See* Seamus Lagan Decl. ¶ 4. Plaintiff Dermot Brown alleges that the conversion of his shares occurred around July 19, 2001, the date he sent a letter to LETH requesting his share certificate. *See* Brown Decl. ¶¶ 11-12. Thus, these claims appear timely.

3

*v. Bryan*, 810 F.2d 42, 44 (2d Cir. 1987) ("If a defendant fails to assert the statute of limitations defense, the district court ordinarily should not raise it *sua sponte*."); *see also Day v. McDonough*, __ U.S. __, 126 S. Ct. 1675, 1681 (2006) ("A statute of limitations defense . . . is not 'jurisdictional,' hence courts are under no *obligation* to raise the time bar *sua sponte*.") (citations omitted). Moreover, GEEC Bahamas should have been aware of the potential defense through service of the plaintiffs' papers on the default judgment, through the participation in this litigation of the related Delaware corporate entity, and through its predecessor LETH, which also participated in this litigation. GEEC Bahamas failed to file any answer or otherwise appear in this lawsuit, despite its notice of it, and I therefore deem any statute of limitations defense abandoned. Thus, I will proceed to address the merits of plaintiffs' claims.

Plaintiffs have established the elements of liability required to state a common law claim of conversion. Under New York law, conversion is committed "when a defendant exercises unauthorized dominion over personal property in interference with a plaintiff's legal title or superior right of possession." *LoPresti v. Terwilliger,* 126 F.3d 34, 41 (2d Cir. 1997), *quoting Rolls Royce Motor Cars, Inc. v. Schudroff*, 929 F. Supp. 117, 124 (S.D.N.Y. 1996). Conversion also occurs when a defendant, who originally possessed the property lawfully, refuses to turn over the property after it is demanded by plaintiff. *See White v. City of Mount Vernon*, 221 A.D.2d 345, 346, 633 N.Y.S.2d 369 (2d Dep't 1995).

With respect to Agamede Limited ("Agamede"), plaintiffs allege that LETH "refused to provide [a] requested replacement stock certificate" to Agamede, even though Agamede was the rightful owner of 300,000 shares of LETH when Agamede's certificate was stolen or lost. Compl. ¶¶ 10, 11. The individual investor plaintiffs allege that they were promised shares of

LETH stock in exchange for their investment in a company known as Life Energy Technology Holdings, Ltd. ("LETH-Ireland"). Compl. ¶ 21. LETH-Ireland used the funds it raised from plaintiffs to merge with an American company, Healthpak, Inc., which then changed its name to LETH. Compl. ¶¶ 4-5. Five investors contend that they never received any LETH share certificates.[2] Compl. ¶ 23. Eight investors allege that they received LETH stock certificates but that the certificates were issued in the name of Eden Development Limited ("Eden"), a corporation unrelated to plaintiffs, and that defendant refused to reissue the certificates in plaintiffs' names.[3] Compl. ¶ 24. Lastly, one plaintiff, Gerard Slowey, alleges that he originally received a stock certificate issued in the name of Eden, but he eventually received a certificate in his own name. Compl. ¶¶ 32, 34. All but two of the individual investors have provided documentation of their investment in LETH and right to ownership of LETH shares.[4] These allegations sufficiently establish the tort of conversion and thus defendant's liability to plaintiffs.

---

[2] These investors include Dermot Brown, Seamus Maguire, Patrick Finnegan, Katherine Finnegan, and Bartley Finnegan.

[3] These investors are Gerard Lagan, Padraic Maloney, Pat Flynn, Elizabeth Kirkpatrick, Tony Murray, Martin Gleeson, and Pat Gleeson.

[4] Two plaintiffs, Tony Murray and Martin Gleeson, failed to provide any evidence supporting their allegations that they made an investment in LETH and are owed LETH shares. All other plaintiffs provided either a copy of the stock certificate in Eden's name or a letter from LETH confirming that its corporate records indicate that the plaintiff holds a specified number of shares. Accordingly, defendant's liability to Tony Murray and Martin Gleeson is subject to plaintiffs providing the Court with the pertinent documents, or affidavits explaining the lack thereof, within 2 weeks from the date of this Order. *See Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 111 (2d Cir. 1997) (noting that a court must ensure that plaintiffs have established the amount of damages owed in a default judgment).

B.  *Damages*

Although the allegations of a complaint pertaining to liability are deemed admitted upon entry of a default judgment, allegations relating to damages are not. *See Greyhound Exhibitgroup*, 973 F.2d at 158. Rather, claims for damages generally must be established in an evidentiary proceeding at which the plaintiff establishes the basis for the amount of damages and the defendant is afforded the opportunity to contest the amount claimed. *Id.*; *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 111 (2d Cir. 1997); *Fustok v. ContiCommodity Services, Inc.*, 873 F.2d 38, 40 (2d Cir. 1989). A court may make this determination based upon evidence presented at a hearing or upon a review of detailed affidavits and documentary evidence. *See* FED. R. CIV. P. 55(b)(2); *Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 508 (2d Cir. 1991); *Fustok*, 873 F.2d at 40. Defendant has not submitted any opposition to plaintiffs' submissions. Accordingly, a hearing on the issue of damages is not warranted.

*1. Compensatory Damages*

Under New York law, "the usual measure of damages for conversion is the value of the property at the time and place of conversion, plus interest." *Fantis Foods, Inc. v. Standard Importing Co., Inc.*, 49 N.Y.2d 317, 326, 402 N.E.2d 122, 125 (1980). "Where the subject of the conversion ha[s] a fluctuating value, [however,] the measure of damages [i]s its value at the time of conversion or within a reasonable time after the discovery of the conversion, whichever is higher." *Iglesias v. U.S.*, 848 F.2d 362, 364 (2d Cir. 1988). The determination of what constitutes a reasonable time is a fact-specific inquiry. *See Mayer v. Monzo*, 221 N.Y. 442, 446, 117 N.E. 948 (1917).

> The rule is that a person whose stocks have been converted is entitled to a reasonable time after notice of the conversion within which to determine whether he will purchase other stocks in the place thereof and that he may use as a basis for his claim of damages resulting from the conversion the highest prices which have prevailed during such reasonable period.

*Id*. at 446. *See also O'Connor v. Graff*, 186 A.D. 116, 173 N.Y.S. 730 (3rd Dep't 1919). Although plaintiffs argue that ninety days is appropriate, courts have usually allowed no more than thirty days, finding that one month is generally sufficient time in which to investigate the conversion and to decide how to proceed. *See, e.g.*, *Mayer*, 221 N.Y. at 446, 117 N.E. 948 (recognizing that fifteen, thirty, or sixty days may be a reasonable amount of time depending on the circumstances); *O'Connor*, 186 A.D. 116, 173 N.Y.S. 730 (finding thirty days reasonable); *Gelb v. Zimet Brothers, Inc.*, 34 Misc. 2d 401, 228 N.Y.S.2d 111 (N.Y. Sup. Ct. 1962) (citing cases holding a reasonable time to be between seven and twelve days); *Phillips v. Bank of Athens Trust Co.*, 202 Misc. 698, 703, 119 N.Y.S.2d 47, 52 (N.Y. Sup. 1952) (finding one week reasonable). Based on the circumstances in this case, I find that sixty days, although the longest period referred to in the cases cited above, is reasonable. Here, plaintiffs either received a stock certificate in the name of Eden or received no stock certificate at all. Some plaintiffs were lulled, at least to a degree, by letters they received from LETH's principal, Christopher McCormack, confirming their investment. *See, e.g.*, Brown Decl. Ex. D, Patrick Finnegan Decl. Ex. C, Slowey Decl. Ex. D, Gerard Lagan Decl. Ex. C. Finally, the longer period of time also takes into account the fact that the individual investors live in Ireland or Northern Ireland and were communicating with a corporation located in the United States. For all these reasons, I conclude that sixty days is an appropriate time within which to expect plaintiffs to make inquiries to have

the certificates corrected or issued, for LETH to respond, and for plaintiffs to realize their shares had been converted and seek legal advice.

Next, I must determine the date of the conversion for each plaintiff and the highest price of LETH stock within sixty days from the date of each conversion.[5] Because it is a fact-specific inquiry, I discuss each plaintiff in turn.

In February of 2001, Agamede's LETH stock certificate was stolen. Seamus Lagan Decl. ¶ 2. Agamede's managing director, Seamus Lagan, requested a replacement certificate. *Id*. On March 14, 2002, Agamede received a letter from LETH's stock transfer agent definitively stating that LETH would not process a replacement certificate. *Id*. at ¶ 4. Accordingly, I find that March 14, 2002 is the date on which LETH wrongfully converted Agamede's stock certificate. Within sixty days after the conversion, LETH reached a high of $2.00 on March 18, 2002. On February 22, 2006, however, I ordered LETH's stock transfer agent, who was in possession of Agamede's stock certificate, to turn it over to Agamede. *See* Docket Entries 61, 62. Thus, Agamede's damages should be reduced by the difference in price of the stock upon return of its certificate. Nevertheless, Seamus Lagan alleges that he has been unable to sell Agamede's shares, contending that LETH or GEEC Bahamas has interfered with his ability to do so. Seamus Lagan Decl. ¶¶ 3, 37. As a result, Lagan declares that Agamede "face[s] a total loss in the value" of the stock certificate. *Id*. Absent any contradictory evidence, I find that Agamede's inability to sell the shares has resulted in a total loss and I award

---

[5] As plaintiffs propose, I will use the historical price of GEEC Bahamas stock (GEECF), which includes LETH's historical prices, to determine the current value of plaintiffs' damages. *See* Chen Decl. Ex. B.

Agamede $600,000 (300,000 shares x $2.00) in compensatory damages, plus interest from March 14, 2002.

As for the five investors who never received their LETH stock certificates, the conversion occurred at the time that defendant refused to turn over the demanded shares to these individuals. *See White*, 221 A.D.2d at 346, 633 N.Y.S.2d 369. For these plaintiffs, the date of conversion depends upon the timing of the actions taken by each investor. Seamus Maguire and Dermot Brown argue that the conversion of their shares occurred on the dates that they wrote demand letters to LETH – May 3, 2001 and July 19, 2001, respectively. Pl. Mem. pp. 6-7. Plaintiffs, however, fail to take into account defendant's time to respond. Allowing defendant one week to reply, I find that the date of the conversion was May 10, 2001 for Maguire and July 26, 2001 for Brown. The measure of damages for Maguire is $2.50 per share because LETH peaked at that price on July 2, 2001; the measure for Brown is $1.39 per share because LETH's highest closing price within sixty days of the conversion was at that amount on July 30, 2001. As for the Finnegan plaintiffs, they were informed by LETH that the company had no record of their investments. Thus, the conversion occurred on March 22, 2001 for Catherine and Patrick Finnegan, the date on a letter from LETH stating same, and March 23, 2001 for Bartley Finnegan, the date of his conversation with LETH's CEO stating same. Patrick Finnegan Decl. Ex. D; Bartley Finnegan Decl. ¶ 13. For the Finnegans, the highest price of the stock within sixty days of the conversions occurred on May 8, 2001, when it closed at $2.18. Accordingly, I award each of these plaintiffs the following damages:

| Plaintiff | Number of Shares | Price | Total Damages |
|---|---|---|---|
| Dermot Brown | 98,447 | $1.39 | $136,841.33 |
| Seamus Maguire | 2,462 | $2.50 | $6,155.00 |
| Catherine Finnegan | 1,231 | $2.18 | $2,683.58 |
| Patrick Finnegan | 12,306 | $2.18 | $26,827.08 |
| Bartley Finnegan | 15,997 | $2.18 | $34,873.46 |

As for the investors who received shares in a name other than their own, I conclude that the date of the conversion of their shares was March 15, 2001, the date on which LETH issued the stock certificates to these plaintiffs in the name of Eden. *See* Pl. Mem. p. 5. Within sixty days thereafter, the highest closing price for shares of LETH was $2.18, which occurred on May 8, 2001. The following table provides for each of these plaintiffs' damages:

| Plaintiff | Number of Shares | Price | Total Damages |
|---|---|---|---|
| Pat Flynn | 9,705 | $2.18 | $21,156.90 |
| Martin Gleeson | 4,853 | $2.18 | $10,579.54 |
| Pat Gleeson | 4,853 | $2.18 | $10,579.54 |
| Elizabeth Kirkpatrick | 1,231 | $2.18 | $2,683.58 |
| Gerard Lagan | 12,306 | $2.18 | $26,827.08 |
| Padraic Maloney | 20,000 | $2.18 | $43,600.00 |
| Tony Murray | 1,231 | $2.18 | $2,683.58 |

Finally, I turn to the damages for Gerard Slowey. Slowey, like many of the plaintiffs, alleges that he originally received a stock certificate in the name of Eden. Compl. ¶ 32.

According to the complaint, Slowey contends that he received a "stock certificate in his name" in October of 2003. *Id*. at ¶ 34. In his application for damages, however, Slowey alleges that he never received a LETH stock certificate in his name. Gerard Slowey Aff. ¶ 19. Rather, he states that he received an assignment from Eden for his shares in June of 2003, but then never received the corrected certificate. *Id*. at ¶¶ 18, 19. Even if the factual allegations in the complaint were in error and the affidavit is factually correct, as noted earlier, a plaintiff obtaining a default judgment may not recover more than the damages demonstrated by the well-pleaded allegations of the complaint. *See* Fed. R. Civ. P. 54(c). Thus, Slowey's damages should be reduced by the price of the stock on the date that he received his certificate, October, 2003. On October 1, 2003, the stock closed at $1.25. Like the other plaintiffs who received share certificates in the name of Eden, I conclude that the date of the conversion of Slowey's stock was March 15, 2001. The highest closing price of LETH within sixty days thereafter was $2.18 on May 8, 2001. Thus, the measure of damages for Slowey is $.93 per share ($2.18 - $1.25 = $.93) and I award him damages in the amount of $22,889.16 (24,612 shares x $.93).

Plaintiffs' total compensatory damages award amounts to $948,379.83. Additionally, under New York law, plaintiffs are entitled to 9% pre-judgment interest on the compensatory damages from the date of conversion. N.Y. C.P.L.R. §§ 5001(b), 5004. *See also Fantis Foods*, 49 N.Y.2d at 326, 402 N.E.2d at 125; *L. Distillator & Son v. Smith*, 140 Misc. 34, 249 N.Y.S. 525, (N.Y. Mun. Ct. 1931).

### 2. Punitive Damages

In addition to the compensatory damages, plaintiffs seek several million dollars in punitive damages for defendant's action. New York law permits punitive damages where "'the

conversion was accompanied by malice, insult, reckless and willful disregard of the plaintiff's rights, or other proof showing the aggravated nature of the act.'" *Colavito v. New York Organ Donor Network, Inc.*, 438 F.3d 214, 232 (2d Cir. 2006) (citations omitted). *See also Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 341 (S.D.N.Y. 2005); *Waltree Ltd. v. Ing Furman Selz LLC*, 97 F. Supp. 2d 464, 470-471 (S.D.N.Y. 2000); *Don Buchwald & Assocs., Inc. v. Rich*, 281 A.D.2d 329, 723 N.Y.S.2d 8 (1st Dep't 2001); *Swersky v. Dreyer & Traub*, 219 A.D.2d 321, 643 N.Y.S.2d 33, 38 (1st Dep't 1996); *Ashare v. Mirkin, Barre, Saltzstein & Gordon*, 435 N.Y.S.2d 438, 441 (Sup. Ct., Suffolk Co., 1980).

I find that defendant's actions justify an award of punitive damages. LETH and GEEC Bahamas, through its CEO Christopher McCormack, fraudulently converted plaintiffs' shares for their own profit. This is not a case of a negligent error in bookkeeping. Nor was defendant's conduct an isolated incident. Indeed, 14 plaintiffs have come forward in this litigation alleging a pervasive fraud by defendant to deprive them of their investments. Moreover, the corresponding attachments as exhibits to some of the plaintiffs' declarations reveal that defendant simply ignored plaintiffs' requests for refunds, corrected certificates or even an explanation of why they had received share certificates in another's name or no certificate at all. I am also aware, through this litigation, as well as through a related case, *Rostolder v. Life Energy and Tech. Holdings, Inc.*, 03-CV-3375 (E.D.N.Y.), that defendant has been found to have engaged in other fraudulent practices. *See also Liberatore v. Life Energy and Tech. Holdings Inc.*, CV-04-618 (E.D. Va.). Additionally, I previously held that LETH changed its name to Global Environmental Energy Corp. and changed its domicile to Bahamas, steps which common sense suggests were most likely undertaken to avoid LETH's creditors. Docket Entry 62. For these reasons, I conclude

that plaintiffs are entitled to an award of punitive damages. As aptly noted by the New York Court of Appeals, "those who deliberately and cooly engage in a . . . fraudulent scheme, systematically conducted for profit, are very much more likely to pause and consider the consequences if they have to pay more than the actual loss suffered by an individual plaintiff." *Walker*, 10 N.Y.2d at 406, 179 N.E.2d at 499.

In determining an appropriate amount to award, I must consider a variety of factors. The Supreme Court has stated that "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW of North Am., Inc. v. Gore*, 517 U.S. 559, 575, 116 S. Ct. 1589, 1599 (1996). In this regard, the Supreme Court has instructed courts to consider whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419, 123 S. Ct. 1513, 1521 (2003) (*citing Gore*, 517 U.S. at 576-577, 116 S. Ct. at 1599-1600). Applying these factors, I find that a modest award of punitive damages is appropriate. In this case, the harm caused by defendant's actions was purely economic. Moreover, there is no indication in the record to suggest that plaintiffs were particularly vulnerable, or that they were left impoverished as a result of their investments in LETH. As noted earlier, however, the defendant's conduct here was not isolated, or a "mere accident," but rather appears to be part of a broader scheme by defendant to defraud investors and avoid its financial responsibilities. Accordingly, I award plaintiffs punitive

damages in the amount of $1,896,759.66, which is double the compensatory damages award. *See State Farm*, 538 U.S. at 425, 123 S. Ct. at 1524 (recognizing the long history of awarding double, treble, or quadruple damages to punish and deter).

## Conclusion

For the reasons stated above, I award plaintiffs a total judgment of $2,845,139.49, composed of $948,379.83 in compensatory damages and $1,896,759.66 in punitive damages, with prejudgment interest on the compensatory damages at the rate of 9% per annum from the date of conversion. For the convenience of the parties and the Clerk of the Court, I set forth below for each plaintiff the amount of compensatory damages awarded, the date from which pre-judgment interest should be awarded on the compensatory damages, and the proportionate share of punitive damages.

| Plaintiff | Compensatory Damages | Date Pre-Judgment Interest Begins to Run on Compensatory Damages | Punitive Damages |
| --- | --- | --- | --- |
| Agamede Limited | $600,000.00 | 03/14/02 | $1,200,000.00 |
| Dermot Brown | $136,841.33 | 07/19/01 | $273,682.66 |
| Bartley Finnegan | $34,873.46 | 03/23/01 | $69,746.92 |
| Catherine Finnegan | $2,683.58 | 03/22/01 | $5,367.16 |
| Patrick Finnegan | $26,827.08 | 03/22/01 | $53,654.16 |
| Seamus Maguire | $6,155.00 | 05/03/01 | $12,310.00 |
| Elizabeth Kirkpatrick | $2,683.58 | 03/15/01 | $5,367.16 |
| Pat Flynn | $21,156.90 | 03/15/01 | $42,313.80 |

| Plaintiff | Compensatory Damages | Date Pre-Judgment Interest Begins to Run on Compensatory Damages | Punitive Damages |
|---|---|---|---|
| Tony Murray | $2,683.58 | 03/15/01 | $5,367.16 |
| Padraic Maloney | $43,600.00 | 03/15/01 | $87,200.00 |
| Gerard Lagan | $26,827.08 | 03/15/01 | $53,654.16 |
| Pat Gleeson | $10,579.54 | 03/15/01 | $21,159.08 |
| Martin Gleeson | $10,579.54 | 03/15/01 | $21,159.08 |
| Gerard Slowey | $22,889.16 | 03/15/01 | $45,778.32 |

**So Ordered.**

/s/
**Steven M. Gold**
**United States Magistrate Judge**

**Brooklyn, New York**
**January 23, 2007**